# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
)
**WILLIAM MARK SCOTT, et al.,** )
)
    **Plaintiffs,** )
)
         v. )   Case Nos. 17-cv-249, -387 (APM)
)
**J.P. MORGAN CHASE & CO.,** )
)
    **Defendant.** )
_____)

## MEMORANDUM OPINION AND ORDER

*"I consider [trial by jury] as the only anchor, ever yet imagined by man, by which a government can be held to the principles of its constitution." – Thomas Jefferson*[1]

Serving on a jury is among the most important responsibilities of an American citizen. Undoubtedly, fulfilling that obligation interrupts day-to-day life, including taking time away from work. To lessen the inconvenience and financial burden that jury service poses, the federal government and the States compensate jurors for their service. In this modern era, the government has the option of compensating jurors by cash, checks, or, as in the present case, debit cards. Often times, the government partners with privately owned banks to distribute juror compensation.

Plaintiffs William Mark Scott and Ronald Morin allege that they served on juries in the Superior Court of the District of Columbia and received debit cards containing their juror compensation, but did not receive all the compensation to which they were entitled. Specifically, Plaintiffs complain that Defendant J.P. Morgan Chase & Co. forced them to receive their

---

[1] Letter from Thomas Jefferson to Thomas Paine (July 11, 1789), *in* 15 THE PAPERS OF THOMAS JEFFERSON, 27 March 1789–30 November 1789, 266 (Julian P. Boyd ed., 1958), http://founders.archives.gov/documents/Jefferson/01-15-02-0259.

compensation on debit cards, provided them with misleading information about those cards, structured the debit card program so as to prevent them from receiving their full compensation, and charged them outrageous fees for using that compensation. They filed this putative class action against Defendant on behalf of themselves and all others similarly situated, demanding a jury trial and seeking declaratory, injunctive, and compensatory relief under state and federal law.

Before the court are Defendant's Motion to Dismiss and Plaintiffs' Motion to Strike. Defendant asks the court to dismiss Plaintiffs' Consolidated Complaint on the grounds that it fails to name necessary and indispensable parties; it does not state a claim against Defendant; and Defendant is otherwise immune from suit under the doctrine of derivative sovereign immunity. Plaintiff not only opposes Defendant's Motion but also moves to strike the documents Defendant attached to that Motion.

For the reasons that follow, the court denies Plaintiffs' Motion to Strike and Defendant's Motion to Dismiss with respect to Defendant's claim of derivative sovereign immunity. The court defers ruling on the remaining issues in Defendant's Motion. Rather, the court will permit the parties to conduct limited discovery concerning Defendant's assertion that it is immune from suit for its actions relating to the District of Columbia Courts' juror compensation program.

I.   BACKGROUND

The Secretary of the United States Department of the Treasury has authority to designate and employ commercial national banks as its financial agents in order to efficiently distribute public monies. 12 U.S.C. § 90; *United States v. Citizens & S. Nat'l Bank*, 889 F.2d 1067, 1069 (Fed. Cir. 1989). Money does not lose its public character merely by being held in the coffers of commercial banks. *See Citizens & S. Nat'l Bank*, 889 F.2d at 1069 (referencing *Branch v. United*

*States*, 12 Ct. Cl. 281 (1876), *aff'd*, 100 U.S. 673 (1880)). Instead, the money continues to "be regarded as in the public Treasury." *Id.* (internal quotation marks omitted).

In September 2008, the Secretary of the Treasury, acting through the Department of the Treasury's Financial Management Service bureau ("the FMS"), designated Defendant J.P. Morgan Chase & Co. as a federal financial agent and memorialized the relationship in a "Financial Agency Agreement." *See* Def.'s Mot. to Dismiss, ECF No. 18 [hereinafter Def.'s Mot.], Attach. 1, ECF No. 18-1 [hereinafter Levine Decl.], ¶ 2; Def.'s Mot., Ex. 1, ECF No. 18-2 [hereinafter FAA]. The agreement took effect on October 1, 2008, and remained in effect until June 30, 2017. *See* FAA ¶ 2.A; FAA, Amend. 3; Def.'s Reply in Supp. of Def.'s Mot. to Dismiss, ECF No. 22 [hereinafter Def.'s Reply], Attach. 1, ECF No. 22-1 [hereinafter Second Levine Decl.], ¶ 3; Def.'s Reply, Ex. 1, ECF No. 22-2 [hereinafter FAA Ext.]. As the Department of the Treasury's financial agent, Defendant was responsible for executing the U.S. Debit Card Program for federal agencies. *See* FAA, Ex. A. In the spring of 2012, the Department of the Treasury extended the U.S. Debit Card Program to the District of Columbia government. Specifically, the FMS and "District of Columbia Courts" executed a Memorandum of Understanding on April 18, 2012, to use the U.S. Debit Card Program to compensate jurors who serve in the Superior Court of the District of Columbia ("D.C. Superior Court"). *See* Def.'s Mot., Ex. 2, ECF No. 18-3 [hereinafter DTA], ¶ 1.[2] On that same date, the FMS also executed a "Direction to Agent" order that instructed Defendant "to provide U.S. Debit Card Program products and services to DC Courts," effective April 18, 2012, until March 14, 2013, unless extended. *Id.* ¶¶ 2–3.

Plaintiffs William Scott and Ronald Morin served on juries in D.C. Superior Court in July 2016 and January 2017, respectively. *See* Unopposed Mot. to Consolidate, ECF No. 14

---

[2] The Memorandum of Understanding is not presently part of the record.

3

[hereinafter Mot. to Cons.], Consolidated Class Action Compl., ECF No. 14-2 [hereinafter Cons. Compl.], ¶¶ 24–25. Jurors in D.C. Superior Court receive a "travel allowance" of $4 for each day they travel to the courthouse in response to a jury summons and, if selected, they receive an additional "attendance fee" of $30 for each day they serve on a jury. *See* D.C. CODE § 15-718(a), (b), (e); *About Jury Duty*, D.C. COURTS, https://www.dccourts.gov/jurors/about-your-jury-duty ("Subsidy" tab) (last visited Oct. 29, 2017).[3] As a result of Plaintiffs' jury service, Plaintiffs each received a debit card, issued by Defendant, that contained juror compensation, along with written information and instructions about how to access the funds on the card. Cons. Compl. ¶¶ 24–25, 35.

The materials Plaintiffs received outlined the steps required to access their juror compensation. Jurors must activate their debit cards prior to using them by visiting Defendant's website. *See id.* ¶¶ 43–44. The website requires the juror to accept the "Terms of Service" for use of the website, although those Terms of Service do not contain information specific to debit cards received in connection with jury duty. *See id.* ¶¶ 47–48. Jurors also must confirm that they are the individual to whom the card was issued by providing personal information, such as their date of birth and zip code, and then select a personal identification number. *Id.* ¶ 49. The information Plaintiffs received also outlined certain fees attending the use of their cards. *See id.* ¶ 73; Def.'s Mot., Ex. 3, ECF No. 18-4.

The money available on a card can either be withdrawn or used as a cash equivalent. When a juror withdraws money, that transaction is subject to certain fees that are applied to the balance on the card. If a juror elects to withdraw part of or all her juror compensation at one of Defendant's

---

[3] The D.C. Code does not extend its $30 daily compensation for jurors "employed by a federal, state, or local government or by a private employer who pays regular compensation during the period of jury service." D.C. CODE § 15-718(a).

branch locations or at a credit union, then Defendant charges her $7. Cons. Compl. ¶¶ 63, 73.[4] Alternatively, jurors can seek to have the money on their debit cards issued by check, but Defendant charges a $15 check fee. *Id.* ¶¶ 64, 73. As a third option, jurors may use an automated teller machine ("ATM") to access their juror compensation, but certain ATMs charge fees. After one free ATM withdrawal, a juror must use one of Defendant's ATMs or an ATM of another bank in Defendant's network ("in-network ATM") for subsequent withdrawals in order to avoid incurring a fee. *Id.* ¶¶ 59, 73, 97. Defendant's website, however, does not identify any Defendant ATMs or in-network ATMs in the District of Columbia. *Id.* ¶ 60. If a juror chooses to use an out-of-network ATM, then Defendant charges a $2 fee, and the out-of-network ATM's bank charges a separate fee. *See id.* ¶¶ 59, 73. Jurors cannot add money to their debit cards, and, typically, they are only able to make ATMS withdrawals in increments of $20. *See id.* ¶¶ 61, 82.

The debit cards also can be used like cash, but a juror encounters certain fees if she does not know her balance at the time she uses her card. As a general matter, there is no fee when a juror uses her debit card to purchase an item. *See id.* ¶ 73. Defendant charges $0.25, however, for a declined transaction. *Id.* ¶¶ 68, 73. That fee attaches each time a juror tries to make a purchase for which there are insufficient funds. *See id.* ¶¶ 69, 73. A juror can avoid an insufficient funds fee by knowing her precise balance on the card and asking the retailer to use a sum certain towards a purchase, with the remainder of the purchase made by other means—a method of use known as a "split transaction." *See* Hr'g Tr. (draft), Sept. 29, 2017, at 27–28. A juror, therefore, can avoid fees most easily if she knows the balance on the debit card. *See id.*

Determining the card's balance, however, might itself involve a fee. There is no fee associated with making an account balance inquiry through Defendant's website. *See* Def.'s Mot.,

---

[4] Defendant does not have any branches within 90 miles of the District of Columbia. Cons. Compl. ¶ 63.

Ex. 3, ECF No. 18-4; Hr'g Tr. (draft), Sept. 29, 2017, at 61. But if a juror checks her debit card's balance at an ATM, regardless of whether the ATM belongs to Defendant or another bank, then Defendant charges $0.45. Cons. Compl. ¶¶ 67, 73.

Finally, a juror can incur fees by not using the debit card. If a juror does not use her debit card for three consecutive months, then Defendant charges the juror $1.50 for each subsequent month of non-use. *Id.* ¶¶ 71, 73.

Plaintiff Scott incurred several of the fees outlined above. He was selected to serve on a jury for a four-day trial in D.C. Superior Court in July 2016. *Id.* ¶¶ 105–06. After receiving and using the compensation on his debit card for several purchases, his card had a balance of $17. *Id.* ¶ 107. On September 20, 2016, he attempted to use his card and incurred a $0.25 fee for insufficient funds. *See id.* ¶ 108. Later that same day, he attempted to use the card again and, when it was declined for insufficient funds, incurred a second $0.25 fee. *See id.* Because Plaintiff Scott did not use his card thereafter, he incurred a $1.50 inactivity fee on both January 1, 2017, and February 1, 2017, which left a balance of $13. *Id.* ¶¶ 83, 109–11. Plaintiff is unable to retrieve the remaining $13 owed to him because there is no ATM in the District of Columbia that dispenses bills in increments of less than $20, Defendant has no branch locations in the District of Columbia, and Defendant's check fee ($15) exceeds the balance on his debit card. *Id.* ¶ 112. Further, even if Plaintiff Scott traveled 90+ miles outside the District of Columbia to reach one of Defendant's branch locations, he would have to forfeit half the balance on his card in light of Defendant's $7 in-person withdrawal fee. *Id.* ¶¶ 63, 90, 112.

Plaintiff Scott and Plaintiff Morin each filed a putative class-action lawsuit on behalf of himself and others similarly situated to him, which the court consolidated into the present matter.[5]

---

[5] *See* Order, ECF No. 15. Plaintiffs' Consolidated Complaint names three separate classes of plaintiffs. The "Nationwide Class" includes "all individuals in the United States who received compensation for jury service and

Boiled down to its essence, Plaintiffs' Consolidated Complaint challenges three aspects of the juror compensation program: (1) the fees Defendant charges a juror for using or failing to use in a timely manner the money deposited on his or her debit card, *see, e.g.*, *id.* ¶¶ 11, 20, 58–59, 68; (2) the structure of the juror compensation debit card program, including the requirement that jurors receive their compensation on debit cards and the limited means by which jurors can access their compensation, if at all, *see, e.g.*, *id.* ¶¶ 8, 17–18, 21–22, 60–61, 89–91; and (3) the misleading nature of the paperwork jurors receive from Defendant concerning how to access their compensation, *see, e.g.*, *id.* ¶¶ 13, 69, 95–101.

Now before the court are Defendant's Motion to Dismiss and Plaintiffs' Motion to Strike. Defendant asserts that Plaintiffs failed to join the United States Department of the Treasury and District of Columbia Courts, each of which is a necessary and indispensable party to this litigation. Additionally, Defendant contends that Plaintiffs have not pleaded any plausible claim for liability. Lastly, Defendant believes that it cannot be held legally responsible for any action alleged in the Consolidated Complaint because, as an agent of the government, the doctrine of derivative sovereign immunity insulates it from liability.[6] To support its claims, Defendant filed with its Motion and Reply several documents relating to the U.S. Debit Card Program, including the Financial Agency Agreement, Direction to Agent, and the written information jurors receive in conjunction with their debit cards. Plaintiffs oppose Defendant's Motion and move to strike the exhibits attached to Defendant's Motion and Reply. *See* Pls.' Opp'n to Def.'s Mot. to Dismiss,

---

were paid with a Chase Debit Card within the applicable statute of limitations." Cons. Compl. ¶ 30. The "Multistate Subclass" encompasses "[a]ll individuals in the United States, except for the state of Iowa, who received compensation for jury service and were paid with a Chase Debit Card within the applicable statute of limitations." *Id.* Lastly, the "D.C. Subclass" covers "[a]ll individuals who received compensation for jury service for jury duty [sic] in the Superior Court of the District of Columbia and were paid with a Chase Debit card within the applicable statute of limitations." *Id.* The court defers ruling on class certification at this time.

[6] Defendant also raises the government contractor defense. *See* Def.'s Mot. at 22–23. For the reasons that follow, at this juncture, the court addresses only Defendant's invocation of derivative sovereign immunity.

7

ECF No. 19; Pls.' Mot. to Strike or Disregard Extraneous Materials, ECF No. 21 [hereinafter Pls.' Mot. to Strike].

## II. DISCUSSION

The court addresses Plaintiffs' Motion to Strike the documents attached to Defendant's filings before turning to the merits of Defendant's Motion to Dismiss.

### A. Plaintiffs' Motion to Strike

A district court may consider documents attached to a motion to dismiss, without converting the motion into a motion for summary judgment, if those documents' authenticity is not disputed, they were referenced in the complaint, and they are "integral" to one or more of the plaintiff's claims. *See Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015); *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004). To determine how much of a document is incorporated by reference into the plaintiff's complaint, district courts must consider who authored the document, whether the document is reliable, whether the document is necessary to the plaintiff's claims, and whether the plaintiff has adopted the document in full or in part. *See Banneker Ventures*, 798 F.3d at 1133–34.

The court has no trouble concluding that it may review and consider in full the documents Defendant attached to its Motion and Reply. Those documents include the agreement between Defendant and the federal government to carry out the U.S. Debit Card Program; a directive extending that agreement to the District of Columbia Courts; an addendum continuing Defendant's service as a financial agent of the government until June 30, 2017; the written information issued with the juror debit cards and expressly referenced in Plaintiffs' Consolidated Complaint; and two affidavits swearing to the authenticity of the foregoing. *See* FAA; FAA Ext.; DTA; Def.'s Mot., Ex. 3, ECF No. 18-4; Def.'s Mot., Ex. 4, ECF No. 18-5; Def.'s Mot., Ex. 5, ECF No. 18-6; Levine

8

Decl.; Second Levine Decl. These documents are plainly "integral" and "necessary" to Plaintiffs' claims. *See Banneker Ventures*, 798 F.3d at 1133; *Kaempe*, 367 F.3d at 965. Plaintiffs' Consolidated Complaint alleges that Defendant is engaged in a "deceptive and unlawful arrangement"; expressly references the terms of use of a debit card issued to compensate jurors for jury service; and puts at issue the legality of the terms of use of that card. *See, e.g.*, Cons. Compl. ¶¶ 6, 53–54, 59, 63–64, 67–71, 79, 95–103, 118, 127, 139, 144–45, 149, 161–62, 169. Indeed, Plaintiffs' Consolidated Complaint even includes a snapshot of a portion of one document that Defendant attached in full to its Motion. *See id.* ¶ 73. In addition to being referenced in the Consolidated Complaint and relevant to Plaintiffs' claims, the documents do not contain any facts or opinions concerning Defendant's execution of the agreement, which limits any potential prejudice to Plaintiffs. *Cf. Banneker Ventures*, 798 F.3d at 1134. Further, the court is not suspicious of the documents' authenticity. Defendant includes an affidavit representing the authenticity of each document, *see* Levine Decl; Second Levine Decl., and Plaintiffs challenge those documents only on other grounds; namely, that the documents are outdated or have been selectively disclosed, *see* Pls.' Mot. to Strike at 7–8. The additional document attached to Defendant's Reply—a letter from the Department of the Treasury to Defendant, extending Defendant's designation as a financial agent until June 30, 2017—appears to cure Plaintiffs' first concern, and Plaintiffs' generic assertion that the documents have been selectively disclosed is neither persuasive nor dispositive.

Accordingly, Plaintiffs' Motion to Strike is denied.

### B. Defendant's Motion to Dismiss

#### 1. Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The factual allegations in the complaint need not be "detailed"; however, the Federal Rules demand more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*

In evaluating a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must accept a plaintiff's factual allegations as true and "construe the complaint 'in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged.'" *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)). The court need not accept as true either "a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986), or "inferences . . . unsupported by the facts set out in the complaint," *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). If the facts as alleged fail to establish that a plaintiff has stated a claim upon which relief can be granted, then a court must grant the defendant's Rule 12(b)(6) motion. *See Am. Chemistry Council, Inc. v. U.S. Dep't of Health & Human Servs.*, 922 F. Supp. 2d 56, 61 (D.D.C. 2013).

### 2. Whether Defendant May be Held Liable for the Claims Alleged

Defendant asserts that, under the doctrine of derivative sovereign immunity, it is immune from liability for the acts alleged in the Consolidated Complaint, all of which it took pursuant to the government's Financial Agency Agreement or the extension of the U.S. Debit Card Program to the District of Columbia Courts through the Direction to Agent. Defendant does not claim that its immunity goes to the court's jurisdiction and does not move for summary judgment based on

this defense. *See* Hr'g Tr. (draft), Sept. 29, 2017, at 21. Rather, Defendant asserts that its immunity is an affirmative defense and that the court can find this defense precludes litigation beyond the motion to dismiss stage because Plaintiffs have not alleged that the Financial Agency Agreement is unlawful or that Defendant exceeded its authority under that agreement.

Derivative sovereign immunity refers to the principle that a private contractor who acts at the behest of a sovereign entity becomes imbued with some of the sovereign's immunity. To claim this form of qualified immunity, the private contractor must assert "that (1) it was working pursuant to the authorization and direction of the federal government, and (2) the acts of which the plaintiff complained fell within the scope of those government directives." *In re Fort Totten Metrorail Cases*, 895 F. Supp. 2d 48, 73 (D.D.C. 2012) (internal quotation marks omitted); *see In re U.S. Office of Personnel Mgmt. Data Sec. Breach Litig.*, No. 15-1394, 2017 WL 4129193, at *34–35 (D.D.C. Sept. 19, 2017). The private contractor cannot claim immunity either when the contractor "exceed[s] the authority" the government conferred on it or the authority itself "was not validly conferred." *See Campbell-Ewald Co. v. Gomez*, 577 U.S. ___, ___, 136 S. Ct. 663, 673 (2016) (quoting *Yearsley v. W.A. Ross Constr. Co.*, 209 U.S. 18, 21 (1940)). At the motion to dismiss stage, when the validity of the contract between the private contractor and the government is not in dispute, a complaint must contain plausible factual allegations that a private contractor acted pursuant to invalidly conferred authority or exceeded its validly conferred authority in order to survive a defendant's assertion of derivative sovereign immunity. *In re U.S. Office of Personnel Mgmt. Data Sec. Breach Litig.*, 2017 WL 4129193, at *35; *see Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 206–07 (5th Cir. 2009); *cf. Iqbal*, 556 U.S. at 682–83; *Navab-Safavi v. Glassman*, 637 F.3d 311, 317–18 (D.C. Cir. 2011).

Plaintiffs' Consolidated Complaint contains no explicit allegations that Defendant acted

pursuant to invalidly conferred authority or that Defendant exceeded the bounds of authority that was validly conveyed. Plaintiffs make no argument that the National Banking Act itself is unconstitutional, that the existence or the terms of the U.S. Debit Card Program are contrary to the Constitution, or that the Secretary of the Treasury lacks authority to designate Defendant as its agent for the purpose of implementing the U.S. Debit Card Program. At most, Plaintiffs allege that the District of Columbia has acted in violation of its own juror compensation statute. *See* Cons. Compl. ¶¶ 53, 127. Plaintiffs also allege that Defendant "convinced" the District of Columbia to participate in an illegal juror compensation-debit card program, *see id.* ¶ 6, but that assertion is conclusory and, in any event, does not suggest that Defendant exceeded any authority conferred on it by the federal government or the District of Columbia. Consequently, Plaintiffs' Consolidated Complaint does not advance allegations that, on their own, at this juncture, would defeat Defendant's claim of derivative sovereign immunity.

At the same time, however, the documents attached to Defendant's pleadings leave unanswered key questions about Defendant's entitlement to immunity. For starters, the court does not have before it the Memorandum of Understanding between FMS and the District of Columbia Courts which, according to the Financial Agency Agreement, should contain all the "terms and conditions pursuant to which [the District of Columbia Courts'] program will operate and the fees that [the District of Columbia Courts] and/or its cardholders will pay to FMS or [Defendant]." *See* FAA, Ex. A, ¶ 4.b. Thus, the precise terms of the program Defendant operated on behalf of the District of Columbia Courts are not presently known. The documents attached to Plaintiffs' pleadings do not fill that yawning gap in the record. Additionally, it is unclear to the court whether the terms contained in the Memorandum of Understanding, as executed in April 2012, remained in place at the time Plaintiffs' received their debit cards, given that the Direction to Agent may

12

have expired in 2013 and that Plaintiffs allege they served on juries in July 2016 and January 2017. *See* DTA ¶ 2; Cons. Compl. ¶¶ 24–25. Absent knowing the precise terms in effect during the time period when Plaintiffs received their debit cards, the court cannot determine, even at the motion to dismiss stage, whether Defendant "exceeded [its] authority." *See Campbell-Ewald*, 136 S. Ct. at 673.

Even were the court to assume that the terms contained in the Memorandum of Understanding mirror those in the Financial Agency Agreement, certain questions concerning Defendant's claim of immunity would remain. On one hand, if the terms of the Financial Agency Agreement govern the version of the U.S. Debit Card Program implemented in the D.C. Superior Court, then Defendant arguably is immune from suit for any claim pertaining to the amount of fees it charged for a particular transaction. The Financial Agency Agreement plainly dictates the fees jurors are to be charged, and those are the same fees that the Consolidated Complaint alleges were charged. *Compare* Cons. Compl. ¶¶ 63–64, 68, 71, 73, *with* FAA, Ex. C. On the other hand, the documents set forth an ambiguous directive for Defendant, "*[s]ubject to the approval of FMS*," to supply jurors with "cardholder instruction information," including "card carriers, informational brochures, and Cardholder Terms of Use disclosures." FAA, Ex. A ¶ 13.c (emphasis added). That language does not make clear whether Defendant had to secure approval as to the specific words it used to convey the terms of using the debit cards or the visual formatting of that information, or both. If such approvals were required and obtained, then Defendant may be immunized from claims alleging that its informational material was fraudulent or misleading. If, however, the government never approved that information before Defendant gave it to jurors, then immunity may prove elusive.

Thus, based on the Consolidated Complaint and the documents offered by Defendant, the

13

court cannot say whether Defendant is immune from suit and, accordingly, denies Defendant's Motion. Construing the allegations and documents in the light most favorable to Plaintiffs, as the court must, the court concludes Plaintiffs have advanced plausible claims that are not defeated, on the present limited record, by Defendant's assertion of derivative sovereign immunity. As such, Defendant's Motion to Dismiss is denied insofar as it asks the court to dismiss the Consolidated Complaint on the ground of derivative sovereign immunity. The parties will be permitted to take limited discovery on that question. Because resolution of the immunity issue may resolve this matter, the court defers ruling on all other aspects of Defendant's Motion to Dismiss.

## IV.  CONCLUSION AND ORDER

In light of the foregoing, the court denies Plaintiffs' Motion to Strike, denies in part Defendant's Motion to Dismiss, and defers ruling on the remainder of Defendant's Motion.

The parties may engage in limited discovery on the question of Defendant's entitlement to derivative sovereign immunity. Discovery shall focus on (1) the terms of the juror compensation-debit card program that the FMS and District of Columbia Courts agreed upon for the time period relevant to this case, and (2) whether Defendant complied with those terms, including with respect to the fees Defendant charged, the structure of the program Defendant implemented, and the content of the instructional information Defendant issued in conjunction with the debit cards. Each side shall be limited to 15 document requests, 15 interrogatories, and three depositions, unless the court permits a greater amount.

The parties may not file a discovery motion without leave of court. In the event that a discovery dispute arises, the parties shall make a good faith effort to resolve or narrow the areas of disagreement. If the parties are unable to resolve the discovery dispute, then the parties shall

jointly call Chambers at (202) 354-3250, at which time the court will either rule on the issue or determine the manner in which it will be handled.

Discovery will close on January 29, 2018, and the parties shall appear for a Post-Discovery Conference on January 30, 2018, at 9:00 a.m. in Courtroom 10.

Dated: October 30, 2017

Amit P. Mehta
United States District Judge